PER CURIAM.
We have for review the findings and recommendation of the Judicial Qualifications Commission (“JQC”) that County Judge Matthew E. McMillan (“Judge McMillan”) be removed from office. We have jurisdiction. Art. V, § 12, Fla. Const. For the reasons expressed below, we approve the findings and the recommendation for removal.
CHARGES
This case arose out of three sets of charges brought against Judge McMillan by the JQC, pursuant to rule 6(f) of the Florida Judicial Qualifications Commission Rules. Essentially, the charges assert that Judge McMillan engaged in conduct that raises a serious issue as to his ability to preside as a judge in an unbiased and impartial manner, and that diminishes public confidence in Florida’s justice system. Judge McMillan was charged with: (1) making explicit campaign promises to favor the State and the police in court proceedings; (2) making explicit promises that he would side against the defense; (3) making unfounded attacks on an incumbent county judge; (4) making unfounded attacks on the local court system and local officials; and (5) improperly presiding over a court case in which he had a direct conflict of interest.
The record reveals that formal proceedings were originally instituted against Judge McMillan on June 29, 1999, on the basis of alleged improprieties during his 1998 campaign for the office of County Court Judge in Manatee County, Florida (Supreme Court Case No. SC95886). Judge McMillan was charged with improper conduct including explicit statements indicating his bias for the State and police in criminal prosecutions, and also misleading and false statements regarding the local justice system, his opponent and others, in violation of canons of the Code of Judicial Conduct (“the code”),[1] constituting the first set of charges (“the election case”). The specific charges asserted:
1. During the campaign, in violation of Canon 1, Canon 2(A), Canon 3(b)(5), Canon 7(A)(3)(a), and Canons 7(A)(3)(d)(i)-(iii), you distributed a piece of campaign literature entitled, “A Fellow Police Office[r] Speaks Out,” in which you stated that “Judge Brown has never been friend to law enforcement in the Courtroom,” and further invited law enforcement officers to “imagine a judge who [would] go to bat for [them].” In that same literature, you also stated that law enforcement officers had the opportunity to “support a fellow police officer who has been there and [would] go to bat” for them as opposed to simply pledging or promising the faithful and impartial performance of your duties in office.
2. In violation of Canon 1, Canon 2(A), Canon 3(b)(5), Canon 7(A)(3)(a) and Canons 7(A)(3)(d)(i)-(iii), in the same campaign literature referenced in paragraph 1, you suggested that you would show bias or partiality toward law enforcement by not suppressing evidence; not overturning convictions; not reducing bail bonds; and not giving lenient *563 sentences, as opposed to simply pledging or promising the faithful and impartial performance of your duties in office.
3. During the campaign, in violation of Canon 1, Canon 2(A), Canon 7(A)(3)(a), and Canons 7(A)(3)(d)(i)-(ii), you falsely or misleadingly asserted that your opponent, Judge George Brown, the incumbent, asserted pressure upon Manatee County Sheriff Charlie Wells not to support you and that Judge Brown had pressured law enforcement officers for preferential treatment for his children when they were arrested.
4. During the campaign, in violation of Canon 1, Canon 2(A), Canon 3(b)(5), Canon 7(A)(3)(a) and Canons 7(A)(3)(d)(i)-(ii), you stated in a letter to the Honorable Earl Moreland, State Attorney for the Twelfth Judicial Circuit, on which you copied the media, that you would “always have the heart of a prosecutor.” At a minimum, statements of this nature erode public confidence in the integrity and impartiality of the judiciary and commit or appear to commit you with respect to issues that may come before the court. You echoed this same theme in other campaign literature when you stated that you would not “rubber stamp” deals reached between prosecutors and defense attorneys and that you anticipated defense attorneys would not be happy with you as judge.
5. During the campaign, in violation of Canon 1, Canon 2(A), Canon 3(B)(5), Canon 7(A)(3)(a) and Canons 7(A)(3)(d)® & (iii), you asserted in a campaign brochure that Manatee County and crime victims had lost millions of dollars in unpaid fines and court costs due to the actions of your opponent. The brochure fails to distinguish between unpaid fines and court costs arising out of felony matters versus those arising solely out of county court matters, thereby giving the false or misleading impression that the millions of dollars in unpaid fines and court costs were directly attributable to the conduct of your opponent and the overall failure of the administration of justice in Manatee County.
6. During the campaign, in violation of Canon 1, Canon 2(A), Canon 7(A)(3)(a), and Canons 7(A)(3)(d)(i)-(iii), you published a brochure entitled, “16-Year Judge Brown Treats Crime Like a Part-Time Problem,” and made other campaign statements, including statements in a submission to the editorial board of The Bradenton Herald, in which you engaged in a continued and deliberate attempt to foster the impression that the incumbent was not working as a full-time judge or was otherwise not maintaining a full-time work schedule. For example, in the brochure entitled, “16-Year Judge Brown Treats Crime Like a Part-Time Problem,” you deliberately misrepresented the hours per week that the incumbent worked as well as days off the incumbent took by giving the false or misleading impression that the incumbent took 86 days “off from court” in 1996 and 84 days “off from court” in 1997.
7. During the campaign, in violation of Canon 1, Canon 2(A), Canon 7(A)(3)(a), and Canon 7(A)(3)(d)(iii), and in the same brochure entitled, “16-Year Judge Brown Treats Crime Like a Part-Time Problem,” you falsely or misleadingly stated that the court system was overloaded and blamed this condition on the failure of your opponent, the incumbent, to perform the duties of his office.
8. During the campaign, in violation of Canon 1, Canon 2(A), Canon 7(A)(3)(a), and Canons 7(A)(3)(d)(i)-(iii) in a packet of campaign materials you furnished to the editorial board of The Bradenton Herald, you falsely or mis *564 leadingly represented the incumbent’s sentencing practices and procedures with respect to: (i) violation of probation in domestic battery cases; and (ii) prostitution cases.
9. During the campaign, in violation of Canon 1, Canon 2(A), Canon 3(b)(9), Canon 7(A)(3)(a), and Canons 7(A)(3)(d)(i)-(iii), you falsely and misleadingly misrepresented the incumbent’s actions as to the sentencing of a defendant, Vincent Born, by giving the impression that the defendant had served no jail time when, in fact, the defendant had served a substantial number of days in jail before his guilty plea was accepted.
10. During the campaign, in violation of Canon 1, Canon 2(A), Canon 7(A)(3)(a), and Canons 7(A)(3)(d)(i)-(iii), you distributed a campaign brochure entitled “16-Year Incumbent Judge George Brown Gives Criminals a Good Deal” in which you stated that Judge Brown is “soft on crime” because “Court records show that Judge Brown gives criminals such light sentences that of 91,000 cases, only 300 people have asked for a jury trial,” thereby misleading the public concerning the effect that negotiated plea agreements have on the number of criminal cases that are actually tried, irrespective of the particular judge that is assigned to a case. At a minimum, such statements misrepresent a fact or the qualifications of the incumbent.
11. During the campaign, in violation of Canon 1, Canon 2(A) and Canon 7(A)(3)(a), you engaged in conduct unbecoming a candidate for lacking the dignity appropriate to judicial office, which had the effect of bringing the judiciary into disrepute, by making the statements set forth in ¶¶ 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 of this complaint and those contained in a brochure entitled, “Please Help Me Make Our Courts Work Better.” These statements inappropriately attack the judicial system, and, by the breadth of your unsubstantiated criticisms, adversely impair the public perception of the impartiality, independence and responsibility of the entire judiciary of Manatee County, Florida.
Initially, the JQC and Judge McMillan entered into a stipulation whereby Judge McMillan admitted to many of these charges and further agreed not to contest the findings and recommendation of the JQC, including a recommendation of discipline that provided:
1. Public reprimand to be delivered personally to the Judge before the Supreme Court of Florida;
2. Six-month suspension without pay;
3. Public apology to the citizens of Manatee County; and
4. Payment of all court reporter’s fees incurred by the Commission.
Upon review, this Court rejected the recommended discipline and remanded the case back to the JQC with specific directions for “further proceedings on the merits of the issues of misconduct as well as the appropriate discipline.”
ADDITIONAL CHARGES
While the election charges were pending in this Court additional charges were filed against Judge McMillan involving actual cases in which Judge McMillan acted as a judge. These charges arose out of two court cases referred to as State v. Ocura, No. 00-348-T (Fla. 12th Cir.Ct.) (“the Ocura case”), and Lohrey v. Eastman, No.2000-CC-000288 (Fla. Manatee County Ct.) (“the Lohrey case”) (Supreme Court Case No. SC00-703).
In the Ocura case it was alleged that Judge McMillan had personally witnessed Mr. Ocura allegedly driving intoxicated, *565 and that he personally notified the police and provided a witness statement at the scene of Mr. Ocura’s arrest. On the following morning after Mr. Ocura’s arrest and jailing, Judge McMillan intentionally prevailed upon the assigned judge to allow him to personally preside over Mr. Ocura’s first appearance in court. Thereafter, knowing of his personal involvement and direct conflict in the case, Judge McMillan then presided over Mr. Ocura’s case and also ordered an allegedly inappropriate excessive bond of $100,000 that was later reduced by another judge. The Lohrey complaint stated that Judge McMillan initially entered an order disqualifying himself and later withdrew his own disqualification order and proceeded to decide the merits of the case at the request of the party seeking relief.
The formal charges in the Ocura and Lohrey cases alleged:
[1. The Ocura case.] The acts described above [concerning the arrest and first appearance hearing of Mr. Ocura], if they occurred as alleged, were in violation of Canon 1, Canon 2A, Canon 3B(1) and Canon 3(E) of the Code of Judicial Conduct and occurred at a time when you [Judge McMillan] should have been circumspect in: (i) avoiding any impropriety or the appearance of impropriety; or (ii) engaging in any conduct which might erode public confidence in the integrity and impartiality of the judiciary.
[2. The Lohrey case.] The acts described above [concerning the disqualification of Judge McMillan and his reentry into the case], if they occurred as alleged, were in violation of Canon 1, Canon 2A, Canon 3B(1), and Canon 3E of the Code of judicial Conduct and well established law and demonstrate a cumulative pattern of judicial misconduct. The acts described above, if true as alleged, also occurred at a time when you should have been circumspect in: (i) avoiding any impropriety or the appearance of impropriety; or (ii) engaging in any conduct which might erode public confidence in the integrity and impartiality of the judiciary.
Subsequent to this Court’s remand of the election case back to the JQC, the JQC consolidated all three cases for hearing: the election charges, the Ocura case, and the Lohrey case.
The JQC adjudicatory panel held hearings on October 30 through November 2, 2000, in which evidence was presented by both sides. Thereafter, the JQC filed its Findings, Conclusions and Recommendations by the Hearing Panel of the Judicial Qualifications Commission. Ultimately, the JQC found Judge McMillan not guilty on charge 2 and subparagraph (i) of charge 8 of the election case; and not guilty in the Lohrey case. However, the JQC sustained all of the remaining charges and recommended Judge McMillan’s removal from office for these combined violations.
FINDINGS OF FACT
This Court has previously set out the standard for our review of the JQC’s findings of fact:
Before reporting findings of fact to this Court, the JQC must conclude that they are established by clear and convincing evidence. In re McAllister, 646 So.2d 173, 177 (Fla.1994). This Court must then review the findings and determine whether they meet this quantum of proof, a standard which requires more proof than a “preponderance of the evidence” but the less than “beyond and to the exclusion of a reasonable doubt.” In re Davey, 645 So.2d 398, 404 (Fla.1994). If the findings meet this intermediate standard, then they are of persuasive force and are given great weight by this *566 Court. See In re LaMotte, 341 So.2d 513, 516 (Fla.1977). This is so because the JQC is in a position to evaluate the testimony and evidence firsthand. See In re Crowell, 379 So.2d 107 (Fla.1979). However, the ultimate power and responsibility in making a determination rests with this Court.
In re Graziano, 696 So.2d 744, 753 (Fla.1997). After extensive review of the record and the evidence submitted by both sides, we find an abundance of competent evidence to support the JQC’s conclusions that the charges were established by clear and convincing evidence.

Charge 1

The basis of this charge is founded upon materials sent to “Fellow Police Officer[s]” by Judge McMillan with a banner worded as: “VOTE MATT McMillan FOR MANATEE COUNTY JUDGE,” and a subheading declaring: “A Fellow Police Officer Speaks Out: Good Ole Boy Politics Hurts the Street Officers” (“the police officer letter”). In that same publication, Judge McMillan declares: “Imagine a judge who will go to bat for you”; “Street officers are unhappy with my opponent. You have told me that Judge Brown has never been a friend to law enforcement in the Courtroom.”
On their face, the statements contained in this material appear obviously intended to send a clear message that should he become a judge, Judge McMillan would be partial to law enforcement and the State. The Code of Judicial Conduct is clear and unambiguous as to its proscription against both judges and judicial candidates making “pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office.” Fla. Code Jud. Conduct, Canon 7A (3)(d)(i). We note that at the proceedings Judge McMillan testified that he read and fully understood the code before he began his campaign. Judge McMillan also expressed regret for having sent this letter.

Charge 3

The JQC also found, from the same campaign letter discussed in Charge 1, that Judge McMillan (1) falsely claimed that Judge Brown had put improper pressure on Manatee County Sheriff Charles Wells not to support McMillan, and (2) falsely claimed that Judge Brown had improperly pressured law enforcement officers to give preferential treatment to his children.
Sheriff Wells testified that he chose to support Judge Brown simply because he felt he was the better candidate of the two, and there was absolutely no factual basis for Judge McMillan to claim that Wells had been pressured by Judge Brown for his support. Sheriff Wells also testified that, contrary to Judge McMillan’s assertions, he never agreed to endorse McMillan at any time. The JQC accepted the testimony and credibility of Sheriff Wells and found that Judge McMillan had failed to substantiate his contrary representation during the campaign.
The JQC also found that Judge Brown had not pressured law enforcement personnel to exercise preferential treatment for his children and that Judge McMillan’s statements to the contrary were misrepresentations. Manatee County Deputy Sheriff Dawn Atkinson investigated a complaint by a neighbor concerning one of the Brown children and an incident at the Brown home where Judge Brown’s eight children were present. Deputy Atkinson testified that she took a report from the neighbor but not from anyone at the Brown home. She then testified that she received a phone call from Judge Brown during which she felt that Judge Brown spoke in a demeaning tone of voice. However, she testified that Brown’s only state *567 ment to her was that she had failed to take any statements from his son, and she testified Judge Brown never actually sought any preferential treatment. No arrests or charges were ever made. Judge Brown testified that he was at his home at the time, saw the police car leave, and called the officer merely to express his concern that no statements had been taken from anyone at his home. He asserted that he made no effort at any time, including his conversation with Officer Atkinson, to secure special treatment for his children.
Charge J
Charge 4 is grounded upon a letter sent during the judicial campaign to State Attorney Earl Moreland by Judge McMillan, a former Assistant State Attorney, in which McMillan declared that “I will always have the heart of a prosecutor.” A copy of this letter was also sent to a local newspaper by Judge McMillan. In addition, this charge asserts that McMillan issued judicial campaign literature stating that defense attorneys would be unhappy with McMillan as a judge.
The JQC found that despite Judge McMillan’s explanation that he was merely attempting to correct misimpressions conveyed to Moreland about him, the obvious implications of the statements, including those referring to defense lawyers, were improper for one seeking judicial office. The JQC concluded these statements were simply additional attempts by Judge McMillan to convey to the voting public that he would favor the government as a sitting judge.

Charge 5

Judge McMillan’s campaign brochure asserted that Manatee County had lost over $12 million dollars and that victims of crime had lost over $10 million dollars when fines and court costs had been reduced at the end of court-imposed probation periods. The conclusion of the brochure stated that as a result “offenders are having a good laugh at our expense.” The JQC found that the $12 million figure also included the more numerous circuit court cases, a distinction not mentioned in the brochure, although Judge McMillan admitted to having been aware that the figures were not limited to county court or to Judge Brown’s cases. The JQC found that the brochure was a knowing and false attempt at attributing this loss of funds and supposed defects in the collection system to Judge Brown, who sat as a county judge.

Charges 6-7

Charges 6 and 7 are grounded upon a brochure entitled “16-Year Judge Brown Treats Crime Like a Part-Time Problem” and other statements contained in a written campaign submission by Judge McMillan to the editorial board of The Braden-ton Herald newspaper. Statements in the campaign submission included:
1. For the last four years 16-year incumbent Judge Brown has served in the criminal court, he has averaged only 14 hours a week on the bench.
2. In 1997 he took 84 days off from court and in 1996 he took 86 days off from court.
3. We hear all the time how overloaded our court system is, and it’s no wonder with working hours like that.
4. But, what’s even more amazing, we pay him over $98,000 a year to do this job.
The JQC found this brochure to be a serious and knowing misrepresentation as to Judge Brown’s devotion to his duties, and to have been “perhaps the most serious issue in this unfortunate campaign.”
As found by the JQC, Judge McMillan manipulated the phrase “days off from court” in the brochure to make it appear as though Judge Brown was actually not *568 present at the courthouse at all on those days. Judge McMillan testified that for purposes of calculating the eighty-four and eighty-six days, he considered a “day off from court” any day that Judge Brown did not actually hold county court dealing with county court functions. In that sense, Judge Brown was “off’ anytime he spent time handling matters in chambers; handling any duties or responsibilities as the county administrative judge, which he had been for all of his sixteen years on the bench; handling any duties as a designated circuit judge; handling first-appearance hearings; or handling any of the other myriad responsibilities that a judge has that do not necessarily require sitting on the bench in open court. Tom Nolan, Judge McMillan’s campaign consultant, agreed that the brochure would have in fact led voters to believe that Judge Brown had not been working at all on eighty-four days and eighty-six days in the years in question.
Judge Brown testified and denied being off from court for eighty-four and eighty-six days those years. Judge Brown submitted his calendars for those years and the JQC found the calendars to be consistent with his testimony and inconsistent with Judge McMillan’s campaign representations. In fact, Judge McMillan’s own exhibits showed that in 1997 Judge Brown took a total of twenty-three days off, not eighty-four. The JQC found that Judge McMillan’s figures were simply untrue, and that Judge McMillan was attempting to convince the voters that Judge Brown was at best a part-time judge who took off from work for extended vacation periods.
As to charge 7, the JQC found that Judge McMillan’s claim in his campaign materials that the court system was overloaded and backed up as a result of Judge Brown’s slack schedule and inattention to his duties was also a knowing misrepresentation. A portion of a transcript of a televised town hall meeting in which the two candidates participated revealed as much:
Q. One of the problems we’ve heard the court system is constantly, [sic] there is a backlog of cases that makes it very difficult to get things processed through the court. In your experience, what would you suggest to help alleviate that problem.
[J. Brown]: Let me answer that this way. In Manatee County there is no backlog to be concerned about at all. We have been very fortunate. I have been administrative judge for 16 years and when I first took over the office 16 years ago, I developed some systems that helped unclog things and we’ve been able to, very fortunate to proceed through rapidly with our caseloads so that we have the time to devote to those cases that really need our time....
[Judge McMillan]: I absolutely concur. There is no backlog of cases in Manatee County. But it, one thing it allows us to do that I don’t think we’re currently doing in the criminal justice system is to deal effectively with the problems of domestic violence and drunk driving. I think this lack of a backlog allows us the opportunity to spend more time individually with each case....
Town Hall Meeting (Channel 62 July 20, 1998) (emphasis added). The JQC found that this response by Judge McMillan clearly contradicts his own campaign materials claiming an overwhelming “back-up” of cases in the local court system where Judge Brown worked.

Charge 8

This charge involved misrepresentations in campaign literature sent to The Braden-ton Herald concerning Judge Brown’s sentencing practices in prostitution cases. In *569 those materials Judge McMillan stated that:
Judge Brown has consistently failed to enforce the geographical relocation provision, which allows a judge to enjoin a prostitute from returning to the vicinity where she was arrested.
As a judge, I will see to it that prostitutes and johns are punished in a manner that will ensure they take our justice system seriously. I will enforce the geographical relocation statute, and I will order mandatory treatment and urinalysis when appropriate.
(Emphasis added). When asked about this “geographical relocation statute” at trial, McMillan conceded that there was no such statute or ordinance in Manatee County, but that he was instead referring to a “well established protocol in place.” When also asked about this geographical relocation statute at the hearing, however, Judge Brown testified that there was no such law or protocol. No evidence was submitted by McMillan as to any such law or Brown’s awareness of such a law, much less Judge Brown’s failure to apply it. The JQC found the literature to be inaccurate and the misrepresentations intentional.

Charge 9

This charge also is based upon the packet of campaign materials Judge McMillan submitted to the Bradenton Herald. Specifically, a statement claimed that “[m]y own research on Brown’s rulings has shown a pattern of credit-for-time-served sentences on offenders who barely spend a day in jail.... Why go through the hassle of making an arrest when you know the sentence will be a meaningless slap on the wrist....” Judge McMillan based this claim on a case involving a defendant by the name of Vincent Born. Contrary to the direct implications of Judge McMillan’s assertion, however, the record reflects that Born actually served some fifty-five days. In fact, Judge McMillan explained that his research staff, mainly his wife, simply failed to realize that the “No Jail” indication from the county court printout did not account for actual time served. Judge McMillan stated that this was a mistake, of which he was not only very embarrassed, but which was attributable to his wife’s unfamiliarity with the system.

Charge 10

This charge involves a McMillan campaign brochure entitled “16-year Incumbent Judge George Brown Gives Criminals a Good Deal.” The brochure essentially declared that Judge Brown was soft on crime and that “Court records show Judge Brown gives criminals such light sentences that of 91,000 cases, only 300 people have asked for a jury trial.” First, the substantial number of negotiated pleas and other case dispositions agreed upon by the State drastically reduced the overall numbers. The evidence also demonstrated that the 300 requests for jury trials were not related to the 91,000 figure. The JQC concluded that these statistics were fundamentally flawed and could not serve as a reliable or accurate basis upon which to support the inflammatory assertions about Judge Brown’s sentencing practices. The JQC found this to be a substantial and knowing misrepresentation of Judge Brown’s duties and record as a judge.
The Ocura Case[2]
The Ocura arrest and prosecution occurred after Judge McMillan became a judge and while JQC proceedings arising out of the election were pending. The *570 record reflects that Judge McMillan testified that he saw Mr. Ocura driving in a manner leading Judge McMillan to believe that Mr. Ocura was intoxicated. Judge McMillan then called law enforcement on his cell phone to arrest Mr. Ocura, stopped at the scene, and subsequently signed a witness statement for police at the scene describing Mr. Ocura’s erratic actions. Mr. Ocura’s first appearance on the criminal charges arising out of the driving episode was scheduled in county court the next morning in front of Judge Robert Farrance. Judge Farrance was the sole judge assigned to first appearance for the week in question. Judge McMillan admitted that his normal scheduled duties as a judge that week did not include presiding over first appearances.
On the morning of Mr. Ocura’s first appearance, January 31, Judge McMillan actually went to the room where first appearances are held and approached the first appearance clerk, Valerie Rosas. Ms. Rosas testified that Judge McMillan told her of the previous night’s incident that he had witnessed and he asked her specifically to disclose Mr. Ocura’s blood alcohol level. Ms. Rosas handed Judge McMillan the file, which he proceeded to review. According to both Ms. Rosas and Judge Farrance, as soon as Judge Farrance entered the first appearance room, Judge McMillan asked him if he wanted Judge McMillan to take over. Judge Farrance testified that he initially refused, but upon Judge McMillan’s insistence, he agreed to let him preside. Judge Farrance was not then aware of the Ocura incident.[3]
A transcript of the first appearance proceedings on Mr. Ocura’s case reflects what happened next when Judge McMillan addressed Mr. Ocura:
I’m the guy that was behind you in the car that called the police and had you arrested. So I am probably not a good person to address the issue of your bond except that you blew over a .30 and quite frankly sir, you almost hit several cars and ... at one point you made a u-turn and I thought you were going to run head on into me.
[[Image here]]
Okay, I’m going to set your bond at $100,000 for now, but I’m going to have it reviewed by another judge later, tomorrow, okay? And make sure I’m not out line. Okay we’ll see you tomorrow.
Judge McMillan testified he decided to set such a high bond only after the assistant state attorney on the case informed him of Mr. Ocura’s extensive prior DUI record. As it relates to the reason why Judge McMillan volunteered to do first appearance that morning, the JQC points out this colloquy during Special Counsel’s examination of Judge McMillan:
[Special Counsel]: You were aware when you took the first appearance calendar that Mr. Ocura would be one of the defendants to be arraigned?
[Judge McMillan]: I will tell you, quite frankly, by the time I got finished with my conversation with Farrance, I had forgotten all about Ocura.
Based on this testimony, the JQC also found Judge McMillan to be untruthful and lacking in candor in his response.
The JQC found that McMillan was fully aware of the ethical improprieties implicated in his handling of Mr. Ocura’s first appearance. The JQC further concluded, *571 however, that regardless of Judge McMillan’s motivation, when a judicial officer is a personal witness in a case, but nevertheless intentionally presides over the case, even on preliminary matters, the public’s confidence in the neutrality and impartiality of the judicial system is severely and adversely impacted.
DISCIPLINE
This Court has emphasized that the object of disciplinary proceedings is not for the purpose of inflicting punishment, but rather to gauge a judge’s fitness to serve as an impartial judicial officer. See In re Kelly, 238 So.2d 565, 569 (Fla.1970). In making that determination, the Court has often pointed out that judges should be held to higher ethical standards than lawyers by virtue of their position in the judiciary and the impact of their conduct on public confidence in an impartial justice system. See In re Boyd, 308 So.2d 13, 21 (Fla.1975). At the same time, the Court has recognized that the discipline of removal should not be imposed upon a judge unless the Court concludes that “the judge’s conduct is fundamentally inconsistent with the responsibilities of judicial office.” In re Graziano, 696 So.2d 744, 753 (Fla.1997). That is precisely the situation presented today.
This Court has declared from time immemorial that the lack of bias and partiality is an essential prerequisite to service as a judicial officer. The promise of “Equal Justice Under Law” is essentially predicated upon an independent judiciary committed to fairness and justice in the application of the law to the facts of each individual case. In Rose v. State, 601 So.2d 1181 (Fla.1992), we reaffirmed this long established and oft-repeated principle in our jurisprudence:
The impartiality of the trial judge must be beyond question. In the words of Chief Justice Terrell:
This Court is committed to the doctrine that every litigant is entitled to nothing less than the cold neutrality of an impartial judge.... The exercise of any other policy tends to discredit the judiciary and shadow the administration of justice.
... The attitude of the judge and the atmosphere of the court room should indeed be such that no matter what charge is lodged against a litigant or what cause he is called on to litigate, he can approach the bar with every assurance that he is in a forum where the judicial ermine is everything that it typifies, purity and justice. The guaranty of a fair and impartial trial can mean nothing less than this.
State ex rel. Davis v. Parks, 141 Fla. 516, 519-20, 194 So. 613, 615 (1939).
Id. at 1183. Accordingly, no other principle is more essential to the fair administration of justice than the impartiality of the presiding judge.
As to the charges arising out of Judge McMillan’s campaign for judicial office, the closest this Court has come to considering a case of conduct similar to that involved herein appears to be In re Alley, 699 So.2d 1369 (Fla.1997). In that case, Judge Alley admitted to having committed campaign irregularities not unlike those attributed to Judge McMillan. Despite the serious character of Judge Alley’s campaign conduct, the JQC recommended the discipline of a public reprimand. At the time, we felt “constrained” by the JQC’s recommendation and its consideration of Judge Alley’s candid acknowledgment of misconduct and contrition for her actions.[4] Nevertheless, *572 we made it clear that such behavior in a judicial campaign would not be tolerated and we declared: “[W]e find it difficult to allow one guilty of such egregious conduct to retain the benefits of those violations and remain in office.” Id. at 1370.
Significantly, Judge McMillan’s campaign occurred well after the issuance of our opinion in In re Alley. There is simply no explanation in the record of why the lessons of In re Alley were totally ignored. Further, as delineated above, Judge McMillan’s improper and misleading campaign tactics appear to have exceeded those involved in that case. More importantly, the conduct of Judge McMillan after he became a judge also places this case in a different category. The charges arising out of the Ocura case clearly constitute the most serious charges both because of their nature and the fact that they are based on conduct by a sitting judge. While the misconduct during the campaign reflects a candidate seeking to be elected upon promises of partiality, Judge McMillan’s misconduct on the bench in the Ocura case reflects a willingness to sit in judgment in the face of a blatant conflict of interest and personal bias.
During the JQC proceedings Judge McMillan attempted to justify his conduct on the grounds that there was a conspiracy in Manatee County to prevent his election. He asserted that his election was necessary to break up such conspiracies of power. The JQC found no factual basis or merit for this contention. Further, this Court has ordered the removal of judges who submitted a similar personal rationalization and justification for their improper conduct:
Judge Shea justifies his conduct as an attempt to improve the administration of justice in the Upper Keys and to improve access to mental health resources in the community. In [In re] Graham, [620 So.2d 1273 (Fla.1993) ], this Court removed a judge who abused his judicial power but attempted to justify his conduct as an effort to rid the county of what the judge perceived as political favoritism and corruption. This Court found that the alleged misconduct of others did not justify the judge’s departure from the guidelines established in the Code of Judicial Conduct. Id. at 1275. Similarly, Judge Shea’s allegations of improper conduct on the part of others do not excuse his abuse of his judicial office.
In re Shea, 759 So.2d 631, 638 (Fla.2000). As in Shea and Graham, we reject Judge McMillan’s rationalization for his campaign misconduct. When any person, and most especially a lawyer or judge, has reason to believe that public corruption exists at any level of government, that person is obligated to disclose such information to the appropriate authority without hesitation. However, when charges are leveled without basis in fact, enormous harm is inflicted upon our public institutions by loss of confidence among a public little equipped to sort out the valid from the invalid and campaign rhetoric from fact. In this instance, when the smoke has cleared and the evidence is examined, there appears to be absolutely no credible factual basis for Judge McMillan’s assaults on the local jus *573 tice system and a sitting county judge. Nevertheless, the harm to the system will linger.
CONCLUSION
We conclude there is clear and convincing evidence in support of the findings of facts of the JQC and we further agree with the Commission’s recommendation for Judge McMillan’s removal based upon cumulative misconduct. Moreover, we agree with the JQC that the combined effect of the proven misconduct, culminating in a blatant breach of the fundamental principles of judicial ethics while sitting as a judge, demonstrate Judge McMillan’s lack of fitness for office. Even if a single impropriety were considered insufficient in isolation, the cumulative weight of the improprieties supports removal.
Chief Justice Terrell’s words guaranteeing to all “the cold neutrality of an impartial judge” have special application here where the personal political aspirations and subsequent vindictiveness of an individual judge have been allowed to tarnish the robes of justice. Further, as we attempted to make clear in In re Alley, to allow someone who has committed such misconduct during a campaign to attain office to then serve the term of the judgeship obtained by such means clearly sends the wrong message to future candidates; that is, the end justifies the means and, thus, all is fair so long as the candidate wins.
Accordingly, for the reasons expressed, Matthew E. McMillan is hereby removed as a judge of the County Court of Manatee County, effective upon this opinion becoming final. We direct that McMillan pay the costs of these proceedings. See In re Hapner, 737 So.2d 1075, 1077 (Fla.1999). We remand this case to the JQC for a determination of the amount of such costs.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.

. See Fla. Code Jud. Conduct, Canons 1-3, 7.

. On charge 11, the JQC submits that the cumulative nature of Judge McMillan's various improprieties warrants the recommended discipline. We address this point in the conclusion section of the opinion, infra.

. Though both Ms. Rosas and Judge Farrance testified that Judge McMillan approached and asked Judge Farrance more than once to have him take over first appearance, Judge McMillan disputed this fact. The JQC accepted Ms. Rosas' and Judge Farrance's versions of the events.

. We noted:
The Respondent filed an answer admit *572 ting all the allegations and acknowledging that as a "candidate for judicial office [she] must exercise the most disciplined restraint upon the activities of her campaign." She further asserted that she had “learned a great lesson and has been deeply sensitized to the need for judges and judicial candidates to show judicial demeanor and restraint when they are required to run in a contested campaign.” The Respondent further filed a waiver of a formal hearing before the Hearing Panel of the JQC.
In re Alley, 699 So.2d at 1369.